[EDITOR'S NOTE: This case is unpublished as indicated by the issuing court.]
MEMORANDUM OF DECISION
The plaintiff brought this action for a dissolution of the parties' marriage on the ground of irretrievable breakdown by complaint returnable to this court April 14, 1992. He also seeks a fair and equitable property settlement and other relief as on file. At the outset of trial, over objection, he was granted leave to amend his claim for relief to add a request for alimony. The defendant appeared by counsel, filed no answer or cross complaint, but filed claims for relief including a dissolution of the marriage, a fair and equitable property settlement and other relief as on file.
At trial, the parties submitted financial affidavits and written proposed orders. Both parties testified, called witnesses to the stand, and introduced numerous documentary materials into evidence, including appraisal reports and tax returns.
From the evidence, the court finds the following facts. CT Page 8316
The plaintiff husband, Richard A. Chyinski, married the defendant wife, Carolyn D. Chyinski, whose birth name was Carolyn D. Jarosz, in Norwich, Connecticut, June 20, 1964. He has resided continuously in this state for at least one year immediately before April 8, 1992, when the complaint was filed. The parties have had two children, issue of the marriage; the wife had two children from a prior marriage, who were adopted by the husband. All four children have reached majority. No other minor children were born to the wife since the date of marriage. Neither spouse has been a recipient of public assistance. This is the wife's second marriage and the husband's first.
All statutory stays have expired and this court has jurisdiction.
The husband is 52 years of age and in good health. He is a high school graduate and has completed a two-year community college degree in applied science. He now is attending a college public accounting program, which he expects to complete in three years. As an accountant, he expects to earn $20,000 to $25,000 per year at entry level. He worked for almost 27 years for United Nuclear Corporation (UNC), when he lost his job in 1990 as a result of a plant closing. Since then, he has been unemployed, except for seasonal employment during the first quarters of 1993 and 1994 for H R Block. He earned $5 per hour. In 1993, he also received a $700 bonus. He expects to continue this seasonal work in the future. He also receives income from rents, stocks and mutual funds.
At UNC, he began as a technician and rose to an engineering project leader earning $55,000 per year during his last full year of employment. He also has two vested pension benefits from his UNC employment which in the aggregate will provide him with $500 per month at age 55.
The wife is 53 years of age, a high school graduate and in good health. During the early years of the marriage the wife remained at home and was the principal caregiver to the children. She did the lion's share of the household tasks, including cooking, cleaning, laundry, shopping and the like. She held part-time seasonal sales clerk jobs at Christmas; she is an accomplished seamstress and did dressmaking, slip covers and fabric work out of her home until about 1974, when the parties started their fabric business, Colchester Mill Fabrics, Inc., a corporation, with a loan from the husband's mother, CT Page 8317 since repaid. The wife has worked there since as chief executive officer and manages it. She receives about $40,000 per annum plus substantial perquisites, which include use of a car, health insurance and a corporate credit card used to pay both business and personal expenses. She reimburses the corporation for her personal expenses. The couple enjoyed a middle class type lifestyle; they wanted for nothing in the nature of material things.
The wife asserts that the cause of the marriage breakdown was the defendant's coldness, lack of affection to her and distance from her. As a result, she basically claims she was in an empty, loveless marriage. She then began an affair with a man in early 1991. The parties finally separated about May of 1991; the wife removed $27,000 from the parties' joint funds and bought a house where she now resides with her male companion, whom she substantially supports. He contributes minimally to their household.
The husband concedes that he may not have demonstrated as much affection to his wife as she wanted and concedes some blame for the marital breakdown. He describes the wife as domineering and overbearing, which caused him to withdraw more. However, he proclaimed his love for her and was willing to take her back. She carried on her affair without his knowledge, until he discovered her with her lover. The plaintiff was shocked and devastated. He was always a good provider and supported her children from the prior marriage until he adopted them. The plaintiff treated them as his and she received no child support from her first husband.
Although the first 27 years of the marriage were less than perfect, the parties worked well together. The husband contributed to the wife's business as a handyman and jack of all trades. He made repairs and improvements to the business premises and to rental property they purchased, into which the business eventually relocated. They raised four children together. They cooperated well in building their jointly-owned family dwelling where the husband now resides.
"Marriage is a coming together for better or worse, hopefully enduring, and intimate to the degree of being sacred. It is an association that promotes a way of life, not causes; a harmony in living, not political faiths; a bilateral loyalty, not commercial or social projects. Billington v. Billington, CT Page 8318220 Conn. 212, 221 (1991), quoting from Griswold v. Connecticut,381 U.S. 479 (1965).
By these standards, I find that the marriage has indeed broken down; I also conclude that although the husband's lack of outward affection to his wife has contributed to that breakdown, I cannot find that the marriage was lifeless before the wife's love affair. Rather, I conclude that the wife must bear a considerably larger portion of the responsibility for its destruction.
The parties have acquired substantial assets during their marriage, through their joint efforts and respective employment. Aside from some monetary assistance from the husband's mother, with down payments and the like, and a gift of a building lot on which their dwelling stands, I find that when taken together, their monetary and non-monetary contributions to the acquisition, preservation and appreciation in value of their assets are approximately equal.
I further find that the parties have equal employability. The husband has greater vocational skills. The wife now has superior earning ability than the husband due to the fabric business, and perhaps superior earning capacity. However, the husband has the safety net of his pensions and significant management skills. He also has tax accounting, handyman and trade skills.
The parties have equal opportunity and ability to acquire capital assets and income in the future.
The major issue that divided the parties was the valuation of certain of their assets. They could not reach agreement as to the value of an undivided parcel of land with two buildings owned by them and provided disparate valuations of the property by themselves and experts. They were also sharply at odds over the value of the fabric business, which is operated in the form of a sub-chapter S corporation, all of which issued and outstanding stock is owned equally by the parties. Again, each provided their own and expert testimony as to the valuation of the corporate business.
Complicating the valuations is the fact that the corporation is a tenant of the parties in their jointly-owned property known as No. 51 Broadway, Colchester, Connecticut. A CT Page 8319 further complication is that 51 Broadway shares the same, now undivided parcel of land with 43 Broadway, a three-family dwelling.
As the parties were entirely unable to reach agreement on the disputed values of Nos. 51 and 43 Broadway, or that of the corporation, those valuations are left to the court.
The husband's expert, Bokoff, a certified public accountant, valued the corporation as of December 31, 1992 at $290,000. He later reviewed the corporation's federal income tax return for the calendar year 1993 (Form 1120, Plaintiff's Exhibit H) and believed that there was no change in its valuation up to the time of trial. He based his opinion of value on the tangible assets of the business, including the inventory, supported by its historically good track record and persistent customer base. He averaged and normalized the business' earnings over the five-year period from 1988 through 1992. He valued the good will at less than 10 percent of the total value and emphasized the fixed tangible assets of the corporation, particularly the inventory. The husband's other expert, Smith, a certified public accountant, valued the corporation at between $425,000 to $450,000. The husband himself values the corporation at between $350,000 to $375,000, and offers to buy the wife out at her valuation of $165,000. Her figure is supported by her expert, Gottesdeiner, a certified public accountant, who valued it at $165,000 as of December 31, 1992, and $158,439 as of the time of the trial.
While all of the experts used basically the same methodology, Gottesdeiner's 1992 appraisal is suspect because first, he only considered the last three years' normalized earnings, in two of which the corporation experienced lower gross sales and in the last of which (1992), it suffered a net loss. Second, he relied on intangible asset values substantially lower than that reported by the corporation on its federal income tax returns. These returns were signed by the wife, and the inventory values stated therein are significantly higher than and inconsistent with those relied upon by Gottesdeiner. Third, his earlier appraisal contained a significant error in the calculation of the good will, which when corrected, would increase his 1992 valuation to about $200,000.
Gottesdeiner's current evaluation, while correcting CT Page 8320 his error in calculating the good will factor, is also suspect. Again, he unjustifiably and substantially discounts the inventory, and he also relies heavily on the past three years' income of the corporation while not giving enough weight to its prior successful years. The court believes that the past three years do not accurately reflect the true picture of the health of the corporation because the defendant has substantially disengaged herself from its day-to-day business operations, only working part time most of this period.
Smith's evaluation is also suspect because he did not deduct for corporate liabilities of approximately $70,000 and used a lower than reasonable annual compensation factor for management.
The court finds that Bokoff's opinion as to valuation is the most credible, and concludes that the business is worth $290,000, less a loan to shareholders of $3,000, leaving a net of $287,000.
The wife argued that Bokoff did not fully take into account the fact that the corporation lost money in the past two years and that its sales had dropped. This claim is unpersuasive, as Bokoff testified he took a longer view and did average out good and bad years. At the same time, it is significant to note that in recent years, the wife spent far less time managing the business and providing hands on effort to it, than she had in prior years. Although the court cannot conclude from the evidence that the wife's substantial disengagement from the business during the past few years caused the decline in annual sales over that period, it is reasonable to infer that her lessened contributions did not help to enhance the value of the business.
The wife's low valuation and seemingly lack of confidence in the business is also belied by the fact that, although she reduced the rental payments paid by the corporation to herself,[1] she did not reduce her salary or cut her personal and business travel expenses. She also recently purchased a 1993 Cadillac which requires loan payments of $164 per week, and incurs credit card expenses which total between $1,500 to $2,000 per month on average, of which some are personal; the rest are incurred by the parties' daughter and the defendant wife on behalf of the business and are paid for by the business. CT Page 8321
In making the finding of value of the parties' corporate business and the other findings of value hereinafter set forth of the real estate, the court has considered the testimony of the parties, the appraisal reports and the testimony and credibility of the expert witnesses. The court has also considered the methodology used by the expert witness and its own general knowledge of the elements of value.
It would serve no useful purpose to set out in specific detail any additional subordinate or underlying factual findings or conclusions with respect to each of the parcels of real estate, with the exception of Nos. 51 and 43 Broadway, where, again, the parties and their respective appraisers are far apart.
Both real estate appraisers, who are certified in this state, relied to different degrees, on the comparable sales and income approaches to value; the husband's appraiser, however, only used the market approach as a `reality check'. The wife's appraiser Staszko provided two appraisal reports and valuations for each property. The first, $177,000 for No. 51 and $38,000 for No. 43, totalled $215,000. The court rejects this approach as not credible because he did not allocate any land to No. 43. The second set of valuations by Staszko were $238,000 for No. 51 and $138,000 for No. 43, a total of $376,000.
The husband's appraiser Buckley valued No. 51 at $375,000 and No. 43 at $163,000, a total of $538,000.
The court doubts that Staszko's second valuations of No. 51 and No. 43 are realistic. His first comparable to No. 51 had less gross building area, no onsite parking and has 0.20 acres, yet sold for $210,000 at a distress type sale, yet by making adjustments, he determined No. 51 to be worth only $28,000 more. He also used a fair market rental value lower than is reasonable, considering the comparable rental values for such space in neighboring areas, and erred in the computation of total building area.
On the other hand, I also conclude that Buckley's appraisal of No. 51 is on the high side. The building values per square foot he derived from his comparable sales were also based on buildings ranging from slightly less than to slightly more than one-half the size of No. 51. In his income approach, he used a $6.50 per square foot fair market rental value, which CT Page 8322 the court believes higher than reasonable for the age and condition of the building and its amenities. The court also believes that the rental value cannot be applied pro-rata to all of the building area, some of which is antiquated space. Also, Buckley did not sufficiently take into account the fact that the business is in the rear of the property and somewhat obscured from public visibility. Considering all of these factors, the court finds the value of No. 51 Broadway to be $310,000 and the value of No. 43 Broadway to be $155,000. No. 44 New London Road, Salem, is found to have a value of $130,000; 35 Broadway, Colchester, a value of $145,000; and No. 401 Salem Turnpike, Bozrah, $142,000.
The marital assets[2] of the parties, excluding their motor vehicles, household furnishings and the like, and their net asset values as found by the court, are as follows:
Colchester Fabric Mills, Inc. (100% of the issued and outstanding shares, $290,000 less loan due stockholders of $3,000 $ 287,000
No. 51 Broadway, Colchester, jointly owned $310,000 No. 43 Broadway, Colchester, jointed owned 155,000 No. 35 Broadway, Colchester, jointly owned 145,000
 Less blanket mortgage of (22,000)[3]
---------- Total net value of Nos. 35, 43 and 51 Broadway $ 588,000
No. 44 New London Road, Salem, jointly owned, $142,000, less mortgage of $12,000 $ 130,000
No. 401 Salem Turnpike, Bozrah, solely in wife's name, $130,000, less mortgage of $108,000 22,000
Bank accounts and money market funds, jointly and solely held 46,900
Common stocks and mutual funds (jointly and solely held) 176,153
Husband's IRA account 22,000
Wife's IRA account 36,000 CT Page 8323
Husband's 401K plan 88,512
Husband's retirement annuities (present value at age 55) 62,908
St. Martin's Time Share (joint) 5,000
Limited Partnership (joint) 10,000
Note receivable (Karen) 10,000
Shareholder's loan 3,000[4]
TOTAL NET ASSET VALUE $1,487,473
The husband omitted to report on his financial affidavit the present values of his retirement annuities, which total $62,908. Also, he failed to report his H R Block seasonal income. The annuity values were ferreted out by the efforts of defendant's counsel, who graciously stipulated that the omission of the annuity values was inadvertent. The seasonal income was testified to by the husband, and although the court recognizes that the financial affidavits themselves may indicate that current income should be based on at least 13 weeks current income, the court believes that in the case of seasonal or casual employment, a longer term average should be used to more properly reflect a recipient's income. Also, the values set forth in the parties' proposed orders differ from those in their financial affidavits in several instances, which has obscured the evidence.
 Our cases have uniformly emphasized the need for full and frank disclosure in that affidavit. "A court is entitled to rely upon the truth and accuracy of sworn statements required by § 380 [now § 463] of the Practice Book, and a misrepresentation of assets and income is a serious and intolerable dereliction on the part of the affiant which goes to the very heart of the judicial proceeding." "These sworn statements have great significance in domestic disputes in that they serve to facilitate the process and avoid the CT Page 8324 necessity of testimony in public by persons still married to each other regarding the circumstances of their formerly private existence." 241, 247 (1987) (defendant entitled to rely on information in plaintiff's financial affidavit); (recognition of "the need for a full and fair disclosure of information contained in a financial affidavit"); ("compliance with the rules concerning the filing of financial affidavits is essential in order for the court to make a reasoned decision with respect to such orders"); ("[t]he sworn financial statements of the parties under Practice Book § 463 have great significance in domestic disputes"). . . .
 "[L]awyers who represent clients in matrimonial dissolutions have a special responsibility for full and fair disclosure, for a searching dialogue, about all of the facts that materially affect the client's rights and interests." (internal citations omitted) Billington v. Billington, 220 Conn. 212, 219-20 (1991).
It is significant to note that the sale of the jointly owned dwelling at No. 44 New London Road, Salem, may result in the imposition of a substantial capital gain tax liability when sold. However, as the parties are near age 55, this liability can be entirely avoided if a sale were deferred until then. Also of significance, is that any distributions from the parties' IRA accounts, the husband's 401K plan and his annuities would be fully taxable as ordinary income to the recipient upon receipt. The court also notes that both the stocks and mutual funds and the Nos. 51, 43 and 35 Broadway, Colchester complex incorporate substantial `paper profits' so that upon sale significant capital gains tax liability would be incurred. The same holds true if the corporation were sold.
The husband's proposal that he be awarded the fabric business is unrealistic and appears vindictive. The wife has a much greater affinity to it than he has; moreover, her employment skills are more focused on this particular business, considering her specialized knowledge of fabrics and suppliers CT Page 8325 and of her persistent customer base, while his skills are not so directed and are of much wider application.
The proposal that the court subdivide Nos. 51 and 43 Broadway is also rejected.[5] While the parties may and should have been able to fairly do so by a comprehensive agreement, the court cannot on the evidence produced. The sketch, Plaintiff's Exhibit AA is wholly inadequate for that purpose. It is not a Class 2 survey. It has no designated author; and it omits a certification that a division of the property would result in no zoning or subdivision regulation violations. Moreover, it fails to describe means of ingress and egress to each parcel, or location of easements, parking areas, signage for No. 51 (located to the rear of No. 43), and other significant appurtenances. Accordingly, the court, in the exercise of its discretion, declines to sever the property.
The court has considered all of the evidence in the light of the factors set forth in General Statutes §§ 46b-62,46b-81 and 46b-82. The court has also considered the income tax implications of its financial awards.
The following orders may enter:
(1) A decree dissolving the marriage on the ground of irretrievable breakdown.
(2) The wife shall take, own and have, free of the husband's claims, all right, title and interest in and to the following property which is hereby assigned to her.
All of the issued and outstanding stock in Colchester Fabric Mills, Inc.; No. 51 Broadway, Colchester, Connecticut; No. 43 Broadway, Colchester, Connecticut; her IRA account; 401 Salem Turnpike, Bozrah, Connecticut; the shareholder's loan due from the corporation; $15,000 in cash from the jointly held Waterhouse account; her own personal checking account and all tangible, personal property now in her possession, including her motor vehicle. She shall pay the blanket mortgage on Nos. 35, 43 and 51 Broadway, Colchester properties according to its tenor and save the husband harmless therefrom; she also shall be responsible for all other loans, liabilities and encumbrances on the real and personal property set out to her herein, including income tax liabilities arising from the corporation, if any, and save the husband harmless therefrom. CT Page 8326
(3) The husband shall take, own and have, free and clear of the wife's claims, all right, title and interest in and to the following property, which is assigned to him.
No. 35 Broadway, Colchester, Connecticut; No. 44 New London Road, Salem, Connecticut; all of the bank accounts, money market funds common stocks and mutual funds, whether solely or jointly owned, shown on the parties financial affidavits and stipulation dated August 19, 1994 (excepting the $15,000 assigned to the wife in (2) above); his IRA account, 401K plan and retirement annuities; the tangible personal property in his possession, including his motor vehicle; the St. Martin time share, the limited partnership interest and the note from Karen; and with the exception of the blanket mortgage on the Colchester real estate, he shall pay all the liabilities and encumbrances on the real and personal property set out to him herein and save the wife harmless therefrom.
(4) No alimony is awarded to either party.
(5) No counsel fees or other costs of trial are awarded to either party.
(6) Each party shall pay the liabilities shown on their respective financial affidavits. In the event the sewer assessment on the Colchester properties is not apportioned among said properties by the authority having jurisdiction to do so, the assessment shall be allocated between the parties in proportion to the values herein assigned to the respective properties.
(7) The parties shall execute and exchange all deeds and other instruments of title, including corporate resignations necessary or incidental to the effectuation of these orders within thirty (30) days hereof.
(8) The wife shall cause the corporation to cooperate with husband's application to obtain health insurance coverage under COBRA and/or other applicable law at his expense.
Teller, J.